ST. VINCENT MEMORIAL HOSPITAL
CORPORATION, Plaintiff,

v.

Donna E. SHALALA, Secretary of
Department of Health & Human
Services, Defendant.

No. 92–3144.

United States District Court,
C.D. Illinois,
Springfield Division.

June 30, 1993.

518

Janet L. Jannusch, Keck, Mahin & Cate, Peoria, IL, Lawrence A. Manson, Keck, Mahin & Cate, Chicago, IL, for plaintiff.

James A. Lewis, Asst. U.S. Atty., Springfield, IL, for defendant.

## OPINION

RICHARD MILLS, District Judge:

Appeal of the decision of the Provider Reimbursement Board (PRRB).

Issue: The PRRB refused capital cost treatment of St. Vincent Memorial Hospital's computerized tomography (CT) scanner for fiscal years 1987, 1988, and 1989. Was this decision arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence or otherwise not in accordance with the law?

We begin *tabula rasa:* no federal court has yet reviewed this question.

### I. *Factual and Procedural Background*

#### A. General Background

The Medicare Act ("the Act"), Pub.L. 89–97, Title I, 79 Stat. 286 (1965) (codified at 42 U.S.C. §§ 1395, et seq.), by which the Medicare program was established, provides federal funding for medical care for the aged and disabled. The Secretary is charged with responsibility for administering the program. She has delegated administration of the program to the Health Care Financing Administration (HCFA). The Secretary also contracts with private organizations to act as

fiscal intermediaries for managing and administering Medicare reimbursement to Medicare providers under the program.

Under Part A of the Act, hospitals and other providers of medical services can enter into provider agreements with the Secretary. 42 U.S.C. § 1395cc. St. Vincent has entered into such an agreement, and its fiscal intermediary is Blue Cross and Blue Shield of Illinois (Blue Cross). As St. Vincent's fiscal intermediary, Blue Cross is responsible for reviewing St. Vincent's claims for reimbursement, which are known as cost reports. Cost reports are submitted at the end of a cost year and are reviewed by the fiscal intermediary, which may make audit adjustments before issuing a Notice of Program Reimbursement. A Notice of Program Reimbursement is the final statement of the amount of reimbursement a fiscal intermediary has decided is due to a provider for a particular cost year.

A provider that is dissatisfied with an intermediary's determination is entitled to a hearing before the Provider Reimbursement Review Board (PRRB) if the amount in controversy is $10,000 or more and the provider makes a timely request within 180 days of the date that the notice of the intermediary's determination was mailed to the provider. 42 U.S.C. § 1395oo(a); 42 C.F.R. §§ 405.-1835(a), 405.1841(a). The PRRB's decision may be reversed, affirmed, or modified by the Secretary. 42 U.S.C. § 1395oo(f). The district court has jurisdiction to review a final reimbursement decision by the PRRB or the Secretary, and judicial review is conducted pursuant to the provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701–706, and is based on the administrative record. 42 U.S.C. § 1395oo(f)(1).

Prior to October 1, 1983, the Medicare program operated on a cost-based reimbursement scheme. Under this scheme, the government would pay providers the "reasonable cost" of covered services furnished to Medicare beneficiaries. 42 U.S.C. § 1395f(b)(1). Congress amended the Social Security Act in 1983. Among the changes made was one requiring the Secretary to use a new prospective payment system (PPS) for reimbursing hospital providers. Pub.L. No. 98–21, Title VI, 97 Stat. 65, 149–152 (1983) (codified as amended at 42 U.S.C. § 1395ww, et seq.). The purpose of adopting the new system of reimbursement was to provide incentives to hold down the costs of hospital care under the Medicare program. Hospitals became subject to the PPS on the first day of their first cost reporting year beginning on or after October 1, 1983.

This case concerns the treatment of costs associated with CT scanner services. Under 42 C.F.R. § 413.130, leases and rentals for the use of depreciable assets may be considered and claimed as "capital-related" costs. If the payments made by St. Vincent to MIL qualify as "capital-related" costs, the hospital may be separately reimbursed for such payments. If such payments are not "capital-related" costs, then they are subsumed in the PPS payments received by the hospital.

For St. Vincent's fiscal years ending June 30, 1987, 1988, and 1989, the Hospital claimed capital-cost treatment of the majority of the costs incurred from the equipment owner with respect to the CT scanner. St. Vincent's Medicare Fiscal Intermediary for the prior year, 1986, had been Aetna Life, who, after originally questioning the pass-through for the CT scanner, had allowed capital-cost treatment for the same contractual arrangement that is in dispute here. Then, for fiscal 1987–89, Blue Cross became the Medicare Fiscal Intermediary for St. Vincent and denied capital-cost pass through for the CT scanner. The effect of this adjustment was that the Medicare Program did not contribute to St. Vincent's 1987–89 capital costs associated with the CT scanner equipment.

Pursuant to 42 U.S.C. § 1395oo(f) (1989), the Hospital appealed the Medicare Fiscal Intermediary's adjustment disallowing CT Scanner costs to the PRRB, an administrative tribunal within HHS. The PRRB decision affirmed the Intermediary's adjustment for 1987–89 in a 2–1 decision. (Sloan, dissenting). The Acting Deputy Administrator of the Health Care Financing Administration (HCFA) declined further review of the case. Thus, the decision of the PRRB constitutes the final decision of Defendant Shalala.

## B. Summary of Facts

The Provider, St. Vincent Memorial Hospital, is a 179–bed, acute care, non-profit, general hospital which also operates a 50–bed skilled nursing unit. This appeal concerns the intermediary's treatment of costs associated with the provision of computerized tomographic (CT) scanning services under an agreement with an unrelated party.

On October 26, 1982, St. Vincent entered into an agreement with Mobile Imaging Laboratories, Inc. (MIL) for the provision of CT scanning services for a term of three years. Under this agreement, MIL provided fixed-site CT scanning equipment installed at St. Vincent's facility and furnished appropriate technicians/technologists' services to perform the CT scanning procedures requested by St. Vincent for its inpatients and outpatients. In addition to providing equipment and personnel, MIL was responsible for site preparation, installation and maintenance of the equipment and cross-training of St. Vincent's personnel. MIL also agreed to carry public and professional liability insurance consistent with the State's Medical Malpractice Act. As owner of the equipment, MIL bore full financial responsibility for the depreciation or obsolescence of said equipment and would be responsible for removing the equipment at its own cost upon completion or termination of the contract.

With respect to St. Vincent's requirements, the agreement states that adequate space within the hospital facility must be provided to accommodate the equipment and furnishings. St. Vincent also agreed to provide housekeeping and all utilities necessary for the space and equipment, and to furnish the necessary administrative services to support the provision of this patient care service. Only St. Vincent's patients under the care of its medical staff could utilize the CT scanning services with St. Vincent establishing all charges and receiving all payments for the services rendered.

In consideration of MIL's performance under the agreement, St. Vincent agreed to pay MIL at rates predicated on a sliding scale, fee-for-service schedule based on the average number and type of CT scans performed. During the initial period of this agreement (Fiscal Years 1983–1985), capital costs associated with the CT scanning services furnished by St. Vincent were neither claimed nor reimbursed under the Medicare program.

In 1985, the arrangement between St. Vincent and MIL changed and an amendment to the existing contract was effected. The amendment provided for the installation of a new third-generation CT scanner (Toshiba TCT 80A) for which MIL accepted full responsibility for the installation and cost of renovation to accommodate the operation of the new equipment. The term of the contract was extended for a period of five years; however, at the end of three years St. Vincent had the following options:

1. Allow the contract to extend until the end of its term with prices adjusted for inflation.

2. Purchase the equipment from MIL for a price of $225,000 plus sales taxes.

3. Lease the equipment from MIL for the balance of the term of contract for a price of $11,000 per month.

4. Upgrade the equipment to a new unit (costing not more than $700,000) for a 20 percent increase in cost per scan over inflation adjusted costs for a five year period.

During the 1982–1985 period, MIL employees operated the CT scanning equipment and were required to train several hospital employees to operate the CT scanning unit. However, after installation of the new Toshiba unit, only hospital employees operated the CT scanning equipment. MIL's services were limited only to providing technical support of the equipment and performing/arranging for maintenance of the Toshiba CT scanner. In accordance with Exhibit B–2 to the Contract Amendment, a new fee-for-service schedule was established with revised rates based on the number and type of CT scans performed. Footnotes to the fee schedule stated that the cost of film and contrast material was to be borne by St. Vincent, and that the 1985 rates may increase as the CPI rate or the hospital market basket rate increased. However, no increase greater than eight percent per year would be permitted.

Subsequent to the contract amendment in 1985, the operational relationship between St. Vincent and MIL for CT scanning services remained constant for the 1986–1989 fiscal years. Throughout this period, St. Vincent claimed a portion of the payments made to MIL as "capital-related" (pass-through) costs to be excluded from the Prospective Payment System (PPS). For the fiscal year ended June 30, 1986, Aetna initially questioned St. Vincent's treatment of the payments made to MIL under the contractual arrangement. However, Aetna ultimately allowed approximately $17,000 to $18,000 per month as "capital-related" costs. After fiscal year 1986, Aetna ceased being St. Vincent's fiscal Intermediary and the Blue Cross and Blue Shield Association assumed that role.

Based on its review of St. Vincent's cost reports for the fiscal years ended June 30, 1987, 1988 and 1989, the Intermediary denied St. Vincent's treatment of the contractual payments as "capital-related" costs. The effect of the Intermediary's determinations on Medicare reimbursement is approximately $64,000, $60,000, and $20,000 for fiscal years 1987, 1988 and 1989, respectively. St. Vincent timely appealed the Intermediary's determinations to the Provider Reimbursement Review Board (Board) pursuant to 42 C.F.R. §§ 405.1835–.1841 and has met the jurisdictional requirements of those regulations.

## II. Standard of Review

Judicial review of the agency's decision is governed by 5 U.S.C. § 706, which requires that an agency action be affirmed unless it is arbitrary and capricious, contrary to law, or unsupported by substantial evidence. 5 U.S.C. § 706; see also Daviess County Hosp. v. Bowen, 811 F.2d 338, 343 (7th Cir.1987) ("The Secretary's decision may not be disturbed unless it is arbitrary, capricious, an abuse of discretion, or otherwise contrary to law; contrary to constitutional right, power privilege or immunity; exceeding of statutory jurisdiction, or falling short of statutory right; reached in violation of established procedure; or unsupported by substantial evidence.") In evaluating agency action, a reviewing court accords considerable deference to the agency's expertise and to the agency's congressionally-mandated duty to administer its own programs. Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). Indeed, "[a]n administrative agency's interpretation of its own regulation merits considerable respect by a reviewing court, and will be controlling absent a showing 'that it is plainly erroneous or inconsistent with the regulation.' Such deference is especially applicable to areas like Medicare reimbursements that require judgments about appropriate cost accounting practices." Abbott–Northwestern Hospital, Inc. v. Schweiker, 698 F.2d 336, 340 (8th Cir.1983) (citations omitted); see also St. Mary of Nazareth Hospital Center v. Department of Health & Human Services, 698 F.2d 1337, 1346 (7th Cir.1983) ("... though courts are not bound by interpretative regulations ..., courts will defer to the agency's judgment unless it can be shown that the agency's determination was arbitrary and capricious or constituted an abuse of discretion.")

However, a reviewing court is not bound by an agency's interpretation of a statute or regulation if that interpretation is inconsistent with the statute under which the regulation was promulgated, or is plainly inconsistent with the wording of the regulation. St. Francis Hospital Center v. Heckler, 714 F.2d 872, 873 (7th Cir.1983).

In addition, the factual findings of the Board may not be overturned if they are based upon substantial evidence in the record. Substantial evidence has been defined by the Supreme Court as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1930)). The Supreme Court has further determined that substantial evidence requires "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966). Accord-

ingly, the PRRB's findings may not be disturbed if they could reasonably be drawn from the evidence presented.

### III. Analysis

The crucial issue in this dispute is whether the CT scanner services provided by MIL to St. Vincent are "capital-related" costs. If they are, the costs are separately reimbursable to the hospital. If not, the cost of the scanner is subsumed in the PPS payments already provided to St. Vincent under the Medicare program.

The regulations generally provide that "leases and rentals, including licenses and royalty fees, are includable in capital related costs . . . ." 42 C.F.R. § 413.130(b)(1). Specifically, when the supplying organization is not related to the provider (as in the case at bar), none of the charges to the provider may be considered "capital-related" unless:

(i) The "capital-related" equipment is leased or rented (as described in paragraph (b) of this section) by the provider;

(ii) The "capital-related" equipment is located on the provider's premises, or is located off side and is on real estate owned, leased or rented by the provider; and

(iii) The "capital-related" portion of the charge is separately specified in the charge to the provider.

42 C.F.R. § 413.130(h)(2). Thus, the question of whether or not the CT scanner was "capital-related" turns on whether or not the MIL–St. Vincent agreement was a "lease." Exactly what the regulations define as a "lease" is by no means crystalline. However, Section 413.130(b)(1) explains that the terms "lease" or "rental of assets" signify that a provider has "possession, use, and enjoyment of the assets."

### A. The Secretary's Position

The Secretary contends that the arrangement between St. Vincent and MIL for the provision of CT scanning services is a "service"—not a lease. The regulations do not define "service." However, the Secretary points out that there are very few indicia of a contractual lease agreement. The agreement, for example, is entitled "CT *Services* Contract Agreement Between St. Vincent Memorial Hospital and Mobile Imaging Laboratories, Inc." (Court's emphasis). Thus, superficially, the agreement does not purport to be a lease agreement. In addition, the Secretary claims that it is undisputed that from October 1982 when the agreement was signed until March 27, 1985 when the agreement was amended, that the agreement was a service agreement. The agreement resembled a service agreement because MIL provided all the staffing for the CT scanner and insured St. Vincent against any failure of the equipment. In addition, the agreement was not binding on either party. If the CT program failed to meet expectations, St. Vincent could either upgrade its service or discontinue its service. The title to the CT scanner also remained with MIL, and MIL was responsible for repairs, maintenance, and removal of the equipment at the end of the agreement. Finally, and most importantly, there was not a set fee for the services. Rather, St. Vincent agreed to pay MIL a fee for "each CT procedure performed." (Tr. 78).

The Secretary also argues that the March 27, 1985 amendments to the St. Vincent–MIL agreement did not change the agreement into a lease. Central to these amendments was the fact that St. Vincent took over the function of employing the technicians who operate the CT scanning equipment. However, the Secretary contends that the fact that St. Vincent supplied operating technicians does not subvert the substance of its agreement with MIL. Indeed, the amendments did not recognize that the agreement was transformed to a lease. In fact, the amendments contained an option to lease the equipment at the end of the term of the agreement. If the amendments intended the agreement to be a lease, the Secretary argues, there would be no point in it containing an option to lease.

Further, the fact that St. Vincent supplied the operating technicians for the new scanner is not dispositive. St. Vincent chose to supply the technicians, it was not required to supply the technicians under the agreement. The implication of the amendment was that St. Vincent, despite choosing to supply its

own technologists, could have requested MIL to take over the staffing of the CT scanner at any time. In any event, the staffing of the CT scanner was only a small part of the bundle of services that MIL provided. Even after the amendments, MIL was still ultimately responsible for the proper operations, maintenance (including a $25,000 x-ray tube replacement), and necessary renovations.

Finally, the Secretary cites *Bethany Methodist Hospital v. Blue Cross & Blue Shield Association/Blue Cross & Blue Shield of Illinois,* [1989–1 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 37,658 (PRRB Hearing Decision, February 15, 1989), for the proposition that "possession, use and enjoyment" of the asset is irrelevant within the context of a service agreement. In the *Bethany* case, the PRRB found that "the agreement the provider entered into was a service contract in which payments were predicated on units of service provided." Similarly, in the instant case, the payments St. Vincent made to MIL were predicated on units of service provided. Therefore, the Secretary argues, "possession, use, and enjoyment" is an improper test to use in this case.

### B. St. Vincent's Position

St. Vincent's position is that the only requirement under federal law for leased or licensed assets to receive "capital-related" cost treatment is that St. Vincent must have "possession, use and enjoyment" of such assets in accordance with 42 C.F.R. § 413.-130(b)(1). Because the CT scanning equipment at issue was (1) located only within the hospital premises; (2) used exclusively by employees and staff of St. Vincent for its patients; and (3) enjoyed only by St. Vincent who established and reaped operational benefits; there is no doubt that St. Vincent had possession, use, and enjoyment of the CT scanning equipment.

Further, St. Vincent argues that the Secretary misreads *Bethany.* In that case, the leasing company, not the provider, furnished the technologists who actually operated the equipment. Accordingly, the Board found that even if Bethany Methodist Hospital did have "possession, use, and enjoyment" of the asset, a lease was not created because the agreement was a license to provide CT scan-

ning services. However, in this case, the provider did actually operate the equipment. Further, because licenses, leases, and royalty fees are all includable in "capital-related" costs under 42 C.F.R. § 413.130, the determinative factor should have been whether "possession, use, and enjoyment" of the capital equipment existed.

### C. The Court's Position

#### (1) *The Test*

■ The Court finds that the proper test to determine whether an asset is "capital-related" is whether the provider has "possession, use, and control" of the asset. 42 C.F.R. § 413.130(b)(1). No consistent test has yet been adopted by the Administrator of the HCFA or a PRRB in determining whether an asset is "capital-related" for the facts at bar. *Bethany,* for example, examined the contract for a mobile CT scanner:

> The contract at issue was titled "Service Agreement for Computerized Axial Tomography Total Body Scanning Services." Under the terms of this agreement, the supplier agreed to provide the CT scanner, all supplies necessary for operation, and personnel to perform the scans. The provider agreed to provide a site and electrical power for the equipment, but the supplier agreed to set up, operate, and maintain the equipment.... The Board determined that these terms described a service contract in which payments were predicated on units of service, similar to the provision of radiology or pathology services by a physician who provides equipment and services under arrangement. The Administrator agrees with this conclusion of the Board. *Even though the contract under review involves the furnishing of equipment, it is one predominantly for the rendition of services. It is not a lease or license within the meaning of 42 C.F.R. § 413.130.*

*Bethany,* PRRB Dec. No. 89–D22, at 19,825 (Emphasis ours).

The analysis in *Bethany* is not particularly helpful. To begin with, though *Bethany* found that the contract was "predominately for the rendition of services," it is unclear what criteria or which of the facts the Ad-

ministrator was emphasizing in reaching that determination. This ambiguity causes problems in the instant case which presents a much closer set of facts. Where in *Bethany* the supplier agreed to set up, operate, and maintain the equipment, St. Vincent personnel operated and—to some degree—maintained the CT scanner after the 1985 amendments.

Second, it is unclear if *Bethany* tracks applicable regulations. Because MIL is unrelated to St. Vincent, the Court turns first to 42 C.F.R. § 413.130(h)(2)(i). Section 413.130(h)(2)(i) provides that no asset may be considered "capital-related" unless the "equipment is leased or rented (as *described* in paragraph (b) of this section)...." (Court's emphasis). The only description of a lease or rental in "paragraph (b)" [42 C.F.R. § 413.130(b)(1)] states that the "terms 'leases' and 'rentals' of assets signify that a provider has 'possession, use, and enjoyment' of the assets." True, what constitutes "possession, use, and enjoyment" is not further defined in the regulations. Nevertheless, there is no attempt in *Bethany* to address any question of "possession, use, and control."

In fact, two PRRBs, *Keokuk Area Hospital v. Blue Cross and Blue Shield Association/Blue Cross and Blue Shield of Iowa,* [1992–2 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 40,119 (PRRB Hearing Decision, March 6, 1992) and *Naeve Health Care Association v. Blue Cross & Blue Shield Association/Blue Cross & Blue Shield of Minnesota,* [1990 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 38,248 (PRRB Hearing Decision, Nov. 6, 1989) avoided the "possession, use, and control" test entirely. ("[a]lthough the provider argues that it has possession, use, and enjoyment of the CT scanner when it is located on the premises, *this does not in and of itself create a lease.*" *Naeve,* PRRB Hearing Dec. No. 90–D3, at 21, 419) (Emphasis ours). Instead, these decisions adopt an alternative test: "[s]ince IAI (equipment supplier) purchased the assets and was fully responsible for the operation, maintenance, and liability associated with the use of the equipment ... [and] the ownership costs and risks of owner-ship were borne solely by IAI ... the agreement the provider entered into was not a capital lease...." *Id.*

The rationale behind this alternate test is that physical use of the equipment is an inadequate parameter for determining "possession" in the context of highly technical equipment worth several hundred thousand dollars. In this context, the Secretary argues that "possession" entails more significant financial risks and responsibilities, including the insurance liability, maintenance costs, and opportunity costs involved in committing an organization, hospital or supplier to a particular piece of expensive equipment.

Nevertheless, these added factors: assuming the risk, insurance liability, etc., are simply not found in the regulations. Nor do they comport with a fair reading of the regulations. Normally, "possession" is equated only with having "control" or a "qualified right" in an asset:

> *Possession.* The detention and *control,* or the manual or ideal custody, of anything which may be the subject of property, for one's use and enjoyment, either as owner or as the proprietor of a *qualified right in it,* and either held personally or by another who exercises it in one's place and name.

Black's Law Dictionary 1047 (5th ed. 1979) (Emphasis ours). This reading is also consistent with 42 C.F.R. § 413.130(b)(1) which includes not only leases and rentals, but *licenses* and *royalty fees* as "capital-related" assets. In short, "possession" does not require a heightened ownership interest in the property (e.g. title, insurance, assuming the risks associated with the asset). Rather, "possession" is found where the possessee has "control" and a "qualified right" in some asset. As the Court will show, St. Vincent had "control" of the CT scanner in the years in question. Moreover, it had a qualified right in the scanner because of its license to allow its personnel to operate the scanner.

In any event, as with *Bethany, Naeve* and *Keokuk* are distinguishable from the case at bar. These cases involve mobile equipment which the supplier transported by truck from hospital to hospital. The issues thus presented as to "possession" and "use" are very different between equipment in a supplier's

truck used at many hospitals and equipment here permanently placed for St. Vincent's exclusive use on the fifth floor of its building. In addition, *Naeve* and *Keokuk* do not address the issue of whether the agreement is "capital-related" when the provider maintains control of the "operation" of the asset.

### (2) *Possession, Use, and Control*

█ The Court agrees with the analysis of dissenting board-member Joseph F. Sloan that *Bethany* dicta indicates that St. Vincent had "possession, use, and enjoyment" of the CT scanner. In *Bethany*, the HCFA Administrator adopted the PRRB's determination that the CT scanner agreement at issue was a "license." Further, the Administrator found that:

The regulation does not authorize capital pass-through payments for all licenses. A qualifying license is one *permitting a hospital to use a piece of depreciable equipment. The Board did not find the license to be for the provider to use a depreciable asset, but for the supplier to be permitted entry on the provider's premises in order for the supplier to place the CT scanner in service and to operate it.*

*Bethany*, PRRB Dec. No. 89–D22 at ¶ 19,825. (Emphasis ours). Importantly, unlike *Bethany* where the equipment supplier's own technicians operated the CT scanner, the 1985 amendments "permitted" St. Vincent to "use" the CT scanner equipment.[1] Not only did St. Vincent personnel operate the scanner, but St. Vincent also established charges for the service and rendered services only to St. Vincent patients through St. Vincent's medical staff. In all respects, St. Vincent had complete control of the use of the equipment. Indeed, the Secretary concedes the fact that St. Vincent had "use" of the equipment (per 42 C.F.R. § 413.130(b)(1)) in its response. St. Vincent's control of the CT scanner, and its "qualifying license" to use a piece of depreciable equipment, supports this Court's finding that St. Vincent had "possession, use, and enjoyment" of the asset.

### (3) *Separate Specification of a Capital Asset*

█ Finally, the Secretary argues that St. Vincent did not comply with the third prong of 42 C.F.R. § 413.130(h)(2). This prong requires that the "capital-related" portion of a charge must be separately specified in the charge to a provider. In this case, the Secretary contends that neither the initial agreement nor the 1985 amendments split out the "capital-related" portion of MIL's charges. The PRRB confirms this argument in its finding that:

The majority of the Board rejects the Provider's belated attempt to comply with the separate charge provision by having a 'capital-related' amount typed unto (sic) MIL's monthly invoices. The 'capital-related' amounts included on the invoices are neither supported by any of the compensation provisions of the contractual agreement nor by any corroborative calculation of how the 'capital-related' portion was determined.

PRRB Decision at 10.

The Court disagrees. First, the Court agrees with St. Vincent that this argument was not properly raised before the PRRB. Under the regulations, St. Vincent had an obligation to submit its annual cost reports of claimed reimbursable costs and to then submit all its records (and those of its suppliers) for audit by the fiscal intermediary (Blue Cross). 42 C.F.R. §§ 405.1801, 405.1803. Blue Cross then audits the costs and in Audit Adjustment Reports, work papers, and in exit conferences "disallows" claimed hospital costs and cites reasons for the refusal. 42 C.F.R. § 405.1803. Blue Cross must "explain (with appropriate use of the applicable money amounts) any difference in the amount determined to be due...." 42 C.F.R. § 405.1803(a)(2). However, as represented by St. Vincent, no notice was ever given to St. Vincent as to the propriety of the separateness of these charges. In addition, Blue Cross did not present this issue at the PRRB hearing so that any questions could be answered. Instead, Blue Cross submitted

---

1. The Court assumes this fact based on the representation of the parties in this suit. However, to date, no copy of the amended agreement has been produced to this Court. Therefore, follow-

ing remand of this case, the Court orders the parties, by stipulation or motion, to produce the amended agreement to this Court.

these issues a week after St. Vincent submitted its post-hearing brief.

■ Second, the finding of the PRRB is not supported by substantial evidence. The Secretary and the PRRB assert that the record reflects that the delineation between capital and other costs on the charges was done *post hoc.* However, only two pieces of evidence were presented to the PRRB on this issue. An October 1987 letter from R.A. Hagglund, President of MIL, to Aetna concedes that MIL did break out costs to comply with Aetna's concerns. Next, a letter from Thomas Curtis, audit manager of the Springfield and Mount Vernon offices of Blue Cross, stated "[a]pparently, MIL started including a typed breakdown in January of 1987." However, at the hearing, Mr. Curtis testified that some MIL invoices received by St. Vincent did not have the charge separated:

> From the audit side, we did get some invoices that had the capital portion of the $17,500 typed in—and I mean typed in the invoice as computer generated and somebody typed in the—MIL reportedly typed in the $17,500 should be capital. But I want to preface that by some of our audit work indicated that was not being done because we obtained audit or invoices that were processed by the hospital accounting department that did not have a separate charge.

This evidence is insufficient to support the PRRB's conclusion the capital-costs were not separated. Mr. Curtis neither personally performed the audit for St. Vincent, nor did he supervise the audit. His inconclusive letter, following the Secretary's interpretation, also contradicts his earlier letter in which he stated that MIL started separating capital-costs in 1987.

■ However, no charge to St. Vincent may be considered a "capital-related" cost unless the "capital-related" portion of the charge is separately specified in the charge to the provider. 42 C.F.R. § 413.-130(h)(2)(iii). The PRRB found that St. Vincent did not submit sufficient evidence on this point. Though St. Vincent may not have had notice on this point, this evidence is prerequisite to a finding that the CT scanner is a "capital-related" cost. The Court therefore remands this matter to the PRRB for the limited purpose of ascertaining whether MIL separately specified the capital-related portion of the CT scanner services in the charge to St. Vincent.

*Ergo,* Plaintiff's motion for summary judgment (d/e 5) is DENIED. Defendant's motion for summary judgment (d/e 7) is DENIED.

The Court REVERSES AND REMANDS the majority decision of the PRRB.

The Court orders the Secretary of HHS to conduct additional hearings as necessary (in accordance with the above opinion and order) for a determination of whether MIL and St. Vincent satisfied 42 C.F.R. § 413.-130(h)(2)(iii) (whether the capital-related portion of the MIL charge to St. Vincent was separately specified in the charge to St. Vincent).

Following remand, if necessary, the Court orders both parties, by stipulation or otherwise to produce a copy of the amended agreement between St. Vincent and MIL (as explained in footnote 1, *supra* ).

Case CLOSED.