CARLE FOUNDATION HOSPITAL,
Plaintiff–Appellant,

v.

Donna E. SHALALA, Secretary of
Health and Human Services,
Defendant–Appellee.

No. 95–1034.

United States Court of Appeals,
Seventh Circuit.

Argued May 16, 1995.

Decided June 16, 1995.

James M. Gaynor, Jr., McDermott, Will & Emery, Chicago, IL, Timothy P. Blanchard (argued), McDermott, Will & Emery, Los Angeles, CA, for plaintiff-appellant Carle Foundation Hosp., an Ill. not-for-profit corp.

David H. Hoff, Asst. U.S. Atty., Office of U.S. Atty., Urbana Div., Urbana, IL, Lauren S. Ruby (argued), Dept. of Health and Human Services, Region V, Office of Gen. Counsel, Chicago, IL, for defendant-appellee Donna E. Shalala, in her official capacity as Secretary of U.S. Dept. of Health and Human Services.

Before EASTERBROOK and KANNE, Circuit Judges, and SHARP, District Judge.*

EASTERBROOK, Circuit Judge.

Taxpayers search the heavens for ways to convert capital investments into ordinary expenses; the latter are immediately deductible, while the former must be depreciated. The federal government offers the same inducement widely. For example, a federal contractor compensated on a cost-plus basis wants to depict as much of its outlay as possible as operating expenses. Since 1983 the Medicare program has given hospitals the opposite incentive. Instead of reimbursing for costs hospitals actually incur, the federal government reimburses them for a weighted average of their costs and those it thinks are normal for a particular service. The weight for actual costs fell to 25% by 1988. 42 U.S.C. § 1395ww(d). Hospitals also may obtain payment toward the cost of their capital plant. Compare 42 U.S.C. § 1395ww(a)(4) with § 1395x(v)(1)(A). Operating expenses thus are not fully reimbursed; but if the provider can recharacterize recurring expenses as capital investment, it obtains a kicker from the Treasury. (In October 1991 capital expenses were rolled into the cost of service. See 56 Fed.Reg. 43358 (Aug. 30, 1991). We speak here of the system in place between 1983 and 1991.)

Carle Foundation Hospital of Urbana, Illinois, believes that its data processing costs are "capital related" and thus compensable because it obtains data processing services from a joint venture in which it is a part owner, which would allow it to depreciate the mainframe computer and related assets. The Administrator of the Health Care Financing Administration (as the delegate of the Secretary of Health and Human Services) disagreed and rejected the Hospital's claim for fiscal year 1988; so did the district court.

■ The Carle Clinic Association, P.C., a private medical group practice, operates from the same building as the Carle Foundation

* Hon. Allen Sharp, Chief Judge of the Northern District of Indiana, sitting by designation.

Hospital. The Carle Foundation owns the building, furnishing space to the Hospital and leasing space to the Clinic. The Hospital and Clinic offer an integrated medical service; almost all members of the Hospital's medical staff are members of the Clinic's medical group. The Hospital and Clinic also share equipment when possible. But the Hospital concedes that it and the Clinic are not "related" under the terms of the Medicare regulations. 42 C.F.R. § 413.17. This sets up our dispute, for the Clinic owns the computer equipment that the Hospital wants to include in its rate base. The Clinic bills the Hospital for actual use of the computer system. If this description of the arrangement—the Hospital as the buyer of a data-processing service—is the correct legal characterization for Medicare purposes, then the Hospital cannot depreciate any portion of its computer costs. According to the Hospital, it is not correct. The Hospital sees four entities here: the Foundation, the Hospital, the Clinic, and a data processing joint venture between the Hospital and the Clinic. The joint venture owns the computer and related equipment and recovers its costs from both Hospital and Clinic in proportion to their use of the system. Because the Hospital is "related" to the joint venture, it is entitled to attribute to the Medicare program its share of the capital costs, the argument concludes. See 42 C.F.R. § 413.130(g)(1).

■ Whether the Hospital and the Clinic have embarked on a joint venture is a question of state law, in the absence of federal regulations addressing the subject. Like partnerships, joint ventures may be created in Illinois without formal paperwork. This gives the Hospital's argument breathing room. Many cases say that a joint venture is a business enterprise conducted for profit, e.g., *In re Johnson*, 133 Ill.2d 516, 525–26, 142 Ill.Dec. 112, 116, 552 N.E.2d 703, 707 (1989), but one may seek a "profit" by reducing one's costs of doing business. Every business enterprise must decide whether to buy inputs in the market or make them itself. This make-or-buy decision depends on anticipated costs, and a cooperative decision to make the goods yields as a "profit" the difference between the market price and the cost of internal production. Nonprofit enter-

prises certainly can agree to share losses, and an agreement to share all gains and losses is a joint venture even if the gains are not "profits" for tax purposes. Unlike the Secretary, then, we believe that a "nonprofit" provider of medical services may recover depreciation expenses on capital equipment that it owns jointly with another entity.

■ But do the Hospital and Clinic *have* a joint venture? The answer depends on a characterization—the sort of thing judges often call a "mixed question of law and fact." Rarely is there a single "right" answer to a dispute about characterization; there are only shadings; some considerations point in one direction and others the opposite way. Because no rule of law gives a single, clear answer, appellate courts engage in deferential review—whether the initial decisionmaker is a district court, *G.J. Leasing Co. v. Union Electric Co.*, 54 F.3d 379, 381–82 (7th Cir.1995), or an administrative agency. The substantial-evidence standard under which we examine the Secretary's decision gives the agency leeway to make up its own mind. If a characterization is sustainable, it must be sustained. *Daviess County Hospital v. Bowen*, 811 F.2d 338, 343 (7th Cir.1987); 5 U.S.C. §§ 701, 706(2). And the Secretary's characterization of this arrangement is readily sustainable.

The lack of a declaration of the existence of a joint venture (together with formal statements of the co-venturer's roles and obligations) is not dispositive against the venture's existence, but it may be persuasive. *O'Brien v. Cacciatore*, 227 Ill.App.3d 836, 844–45, 169 Ill.Dec. 506, 511–12, 591 N.E.2d 1384, 1389–90 (1st Dist.1992). Not a scrap of paper in existence during 1988 suggests that the operation is a joint venture; no documents use this term; none assigns any governance role to the Hospital. The agreement in 1982 establishing the data processing operation says that "space, supplies, and services will be provided by the [Clinic] to the Hospital where practicable and cost effective." That sounds like a contract for sale of services, not like a joint venture. None of the documents obliges the Hospital to obtain its data-processing services from the Clinic's

equipment; a power to terminate at will supports an inference that the Hospital is buying services rather than sharing in the ownership of equipment. The Hospital's accountants also treat it as a purchaser of services rather than a joint venturer. The accounts do not show the Hospital as having an interest in a separate venture; they do not show total income (from both Hospital and Clinic) for data processing and then subtract aggregate costs.

None of this is conclusive. The Hospital and Clinic share data as well as equipment; because patients obtain services from both entities, it is easy to conceive of a data-processing operation furnishing overlapping services to both, rather than being a captive of one selling computer time to the other. The Hospital adds that the price it pays the Clinic is whatever proves necessary to cover costs. It pays not by hour of access but by percentage of use. Its payments rise as the Clinic's use of the equipment falls, even if the Hospital's use remains constant. The Secretary might have seen this feature as a clue that a joint venture was under way, but she did not have to give it conclusive weight. During the course of the administrative dispute the Hospital and Clinic formally declared their computer operations to be a joint venture, but the Secretary did not have to give their declaration retroactive effect; we need not decide what consequence it has for future reimbursement periods. Suppose the Clinic had defaulted during 1988 on its obligations to the supplier of the computer equipment. If there were a Clinic–Hospital joint venture, then the supplier could recover in full from the Hospital. But on this record the Hospital could depict itself as a buyer of services rather than an owner of capital equipment. By setting itself up to have things both ways, the Hospital disabled itself from objecting when the Secretary chose one characterization rather than another.

■ Advancing a second argument, the Hospital contends that it is entitled to compensation even if it has not formed a data-processing joint venture. It invokes 42 C.F.R. § 413.130:

> (b)(1) Subject to the qualifications of paragraphs (b)(2), (4), (5), and (8) of this section, leases and rentals, including licenses and royalty fees, are includable in capital-related costs if they relate to the use of assets that would be depreciable if the provider owned them outright or they relate to land, which is neither depreciable nor amortizable if owned outright. The terms "leases" and "rentals of assets" signify that the provider has possession, use, and enjoyment of the assets.

> * * * * * *

> (h)(2) If the supplying organization is not related to the provider within the meaning of § 413.17, no part of the charge to the provider may be considered a capital-related cost ... unless—

>> (i) The capital-related equipment is leased or rented (as described in paragraph (b) of this section) by the provider;

>> (ii) The capital-related equipment is located on the provider's premises, or is located offsite and is on real estate owned, leased or rented by the provider; and

>> (iii) The capital-related portion of the charge is separately specified in the charge to the provider.

The Hospital observes that the computer equipment would be depreciable if the Hospital owned it, and that it has free access to the equipment. Free access amounts to "possession" and satisfies § 413.130(b)(1), the Hospital believes. The argument continues: because it satisfies § 413.130(b)(1) it necessarily satisfies § 413.130(h)(2)(i); because the equipment is on premises the Foundation leases to the Clinic, § 413.130(h)(2)(ii) has been satisfied; and the satisfaction of § 413.130(h)(2)(iii) is conceded.

The Secretary sees the role and interpretation of § 413.130(b) and (h) differently. She treats the regulation as covering financing leases. If the lease is just a method of paying for equipment that the provider treats as if owned, and the equipment would be depreciable if owned, then the Secretary will look to the economic substance of the transaction rather than the manner of financing. The qualifications in § 413.130(b) and (h) are, on this understanding, essential to

ensure that the "as-if owned" condition is met. Only when the provider has "possession, use, and enjoyment of the assets" to the same extent as an owner would does the transaction satisfy § 413.130(b), and § 413.130(h)(2) sets out the details of what this entails. The provider must be the lessee of the equipment, which must be on the provider's main premises or at a building of which the provider is lessee. The Secretary's reading of the regulation leads inexorably to a denial of the Hospital's claim. The Clinic rather than the Hospital is the lessee of the equipment, which is located not on premises the Hospital owns or leases but on premises the Clinic leases from the Foundation.

As author of the regulation, the Secretary has substantial latitude in its interpretation. *Shalala v. Guernsey Memorial Hospital,* —— U.S. ——, —— – ——, 115 S.Ct. 1232, 1236–37, 131 L.Ed.2d 106 (1995); *Thomas Jefferson University v. Shalala,* —— U.S. ——, ——, 114 S.Ct. 2381, 2386, 129 L.Ed.2d 405 (1994). The Secretary's reading of § 413.130(b) and (h)(2) is a natural one, not the sort of startling assertion that is equivalent to a brand new rule and therefore must be accompanied by notice and comment under the APA. To interpret an ambiguous regulation is to set administrative policy. The Secretary is in charge of that policy and therefore of interpretation within the bounds language sets. See *Homemakers North Shore, Inc. v. Bowen,* 832 F.2d 408 (7th Cir. 1987). Having decided that the Clinic and Hospital had not formed a joint venture, the Secretary was entitled to treat the Clinic rather than the Hospital as owner (or lessee) of the capital equipment. The Clinic did not lease any equipment to the Hospital but sold a service; and the equipment is not located on premises of which the Hospital is owner or lessee.

■ Congress changed the reimbursement rules in 1983 and established a transition period between 1983 and 1987. During this transition period the Secretary's fiscal intermediary allowed the Hospital to treat data processing costs as capital-related. Only for the 1988 fiscal year did the intermediary disallow the Hospital's claim. The Hospital believes that a change of policy violates the requirement in 42 U.S.C. § 1395ww(a)(4) that treatment of expenses be consistent. The Secretary's replies are short and sufficient: (1) the transition rule limits *providers'* ability to reclassify, in order to prevent them from playing both ends against the middle, 48 Fed.Reg. 39752, 39762 (Sept. 1, 1983); here the reclassification was accomplished by the Secretary to achieve the legally mandatory treatment; (2) the 1988 fiscal year at all events comes after the close of the transition period. Although the Secretary extended the transition period administratively into 1988, the final regulation eliminates for 1988 the requirement of consistent treatment during the entire transition. 42 C.F.R. § 412.113(a). The Secretary is entitled to apply the right understanding of her rules to all fiscal periods that begin after October 1, 1986, no matter what the provider and intermediary did in earlier years. We recognize that, by treating data processing expenses as capital costs, the Hospital omitted them from the data used to create the prospective cost-of-service rates. Whether the Secretary should recompute those rates treating data-processing costs as ordinary expenses is a question we need not explore, because the Hospital did not ask the Secretary to do this. It staked its all on putting the costs into the capital account.

■ For essentially the same reasons, 42 U.S.C. § 1395x(v)(1)(A)(i) does not help the Hospital. This subsection requires the Secretary to create reimbursement "methods" that do not shift costs to persons outside the Medicare program. Unless it can recover the costs of data-processing services, the Hospital insists, costs will have been shifted. Yet any shifting cannot be attributed to the Secretary's "methods"; its source is the combination of the intermediary's errors in allowing the Hospital to treat data-processing costs as "capital-related" in earlier years with the Hospital's own decision not to seek a recalculation of the entire cost base with data-processing costs treated as expenses. Section 1395x(v)(1)(A)(ii) creates a means to address case-specific glitches, see *Good Samaritan Hospital v. Shalala,* —— U.S. ——, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993), but

the Hospital has not made an argument under that subsection. Having chosen to accept the treatment of data-processing costs in earlier years, the Hospital was bound to emerge from the 1988 fiscal year either overcompensated or undercompensated. It made a bid for overcompensation and has little ground for beefing when things turned out the other way.

AFFIRMED.