83 F.3d 175
 50 Soc.Sec.Rep.Ser. 656, Medicare & Medicaid Guide
P 44,180
The PUBLIC HOSPITAL OF the TOWN OF SALEM, Plaintiff-Appellant,
v.
Donna E. SHALALA, Secretary of Health and Human Services,
Defendant-Appellee.
 No. 95-3511.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 19, 1996.
Decided May 7, 1996.
 
 Appeal from the United States District Court for the Southern District of Illinois. No. 94-CV-0615-PER--Paul E. Riley, Judge.
 Dorothy Ward, Lawrence A. Manson (argued), Keck, Mahin & Cate, Chicago, IL, for Plaintiff-Appellant.
 Barbara F. Altman (argued), Department of Health and Human Services, Chicago, IL, for Defendant-Appellee.
 Before FLAUM, EASTERBROOK and MANION, Circuit Judges.
 EASTERBROOK, Circuit Judge.
 
 
 1
 Until March 1988 patients at the Public Hospital of Salem, Illinois, had to travel more than 20 miles to a hospital in Centralia for computerized tomography (CT) services. That month United States Medical Management, Inc. (USMM) installed a CT scanner at the Hospital. Under the contract, USMM services the scanner (which it owns and insures), keeps the software up to date, and trains the Hospital's technicians in its use. The Hospital supplies the space, electricity, and staff for daily operation. It pays USMM $285 per scan. The contract does not provide for a monthly rental or for a minimum number of scans. Arranging matters this way served the Hospital's interests, because it was unwilling to take the risk of a purchase or large monthly payment while usage of the scanner remained uncertain. It also served USMM's, which for tax purposes remained the owner of the scanner and was entitled to depreciate the equipment.
 
 
 2
 Tax deductions were worthless to the Hospital, a nonprofit public entity; allocating them to USMM worked to the Hospital's benefit indirectly, through lower prices. But the choice of contractual form had other consequences. The Hospital wants to treat the CT scanner as a capital asset for purposes of the Medicare program. Between October 1983 and September 1991, Medicare providers received extra reimbursement for "capital-related costs." See Carle Foundation Hospital v. Shalala, 57 F.3d 597 (7th Cir.1995), for a description of this program. The Hospital sought reimbursement for $137,000 of capital-related costs on account of the CT scanner in fiscal year 1989, and another $123,000 in fiscal 1990. Although the Provider Reimbursement Review Board concluded that the Hospital is entitled to this reimbursement, the Administrator of the Health Care Financing Administration disagreed. The Administrator acts as the Secretary's delegate; his decision was the final administrative step. On review under 42 U.S.C. § 1395oo(f)(1), the district court entered summary judgment for the Secretary.
 
 
 3
 As we explained in Carle Foundation Hospital, the Medicare statute delegated to the Secretary power to define reimbursable capital-related costs. The Secretary exercised that power by promulgating 42 C.F.R. § 413.130. Section 413.130(a)(3) permits reimbursement for "leases and rentals, including license and royalty fees, for the use of depreciable assets or land, as described in paragraph (b) of this section." That leads us to subsection (b)(1):
 
 
 4
 Subject to the qualifications of paragraphs (b)(2), (4), (5), and (8) of this section, leases and rentals, including licenses and royalty fees, are includable in capital-related costs if they relate to the use of assets that would be depreciable if the provider owned them outright or they relate to land, which is neither depreciable nor amortizable if owned outright. The terms "leases" and "rentals of assets" signify that the provider has possession, use, and enjoyment of the assets.
 
 
 5
 Paragraphs (b)(2), (4), (5), and (8) do not affect the Hospital's claim, but one other subsection of § 413.130 has some bearing:
 
 
 6
 (h)(2) If the supplying organization is not related to the provider within the meaning of § 413.17, no part of the charge to the provider may be considered a capital-related cost ... unless-
 
 
 7
 (i) The capital-related equipment is leased or rented (as described in paragraph (b) of this section) by the provider;
 
 
 8
 (ii) The capital-related equipment is located on the provider's premises, or is located offsite and is on real estate owned, leased or rented by the provider; and
 
 
 9
 (iii) The capital-related portion of the charge is separately specified in the charge to the provider.
 
 
 10
 Subsection (h)(2)(iii) is a potential obstacle to reimbursement, because the contract between USMM and the Hospital did not specify a capital portion of the charge. But USMM later sent the Hospital a letter fixing this at 77 percent of the price, and, although the Administrator was not impressed, the Secretary's appellate brief does not urge this as a ground on which to support the decision. Under § 413.130(h)(2)(i), then, everything depends on whether the CT scanner "is leased or rented (as described in paragraph (b) of this section)". Because the scanner would be depreciable if owned outright, the dispositive question is whether "the provider has possession, use, and enjoyment of the assets."
 
 
 11
 The Administrator gave a negative answer for three principal reasons. First, because USMM was in charge of maintaining the scanner, the Hospital did not have exclusive control of the scanner. Second, the structure of the contract left USMM with all of the risks of loss, low use, or obsolescence of the equipment. Third, the compensation term ($285 per scan, with no minimum) showed that USMM was selling the Hospital a service rather than use of the machine for a period of time. Service fees are operating costs, reimbursed (though only in part) under other provisions of the Medicare Act.
 
 
 12
 St. Vincent Memorial Hospital Corp. v. Shalala, 827 F.Supp. 517 (C.D.Ill.1993), which likewise concerned reimbursement for a CT scanner at a hospital in Illinois, held that a similarly reasoned decision by the Administrator was contrary to § 413.130(b)(1). The court stated that the Secretary may not rely on who bears the risk of loss, or how payment is structured, because Black's Law Dictionary does not define "possession" using those concepts. The district court's opinion in St. Vincent Memorial Hospital persuaded the Provider Reimbursement Review Board, but not the Administrator--who was entitled to maintain his position. A dictionary collects standard usages, but it does not set limits on the scope of language. Both the linguistic and the functional contexts of words offer better clues to meaning than do dictionaries. Congress delegated power to the Secretary, who chose words to implement a particular substantive view. An agency with power to change substance has a corresponding power to interpret; otherwise the rule may fail to achieve its objective. See Homemakers North Shore, Inc. v. Bowen, 832 F.2d 408 (7th Cir.1987). That is why courts regularly grant the author of a regulation leeway in its interpretation, Shalala v. Guernsey Memorial Hospital, --- U.S. ----, ---- - ----, 115 S.Ct. 1232, 1236-37, 131 L.Ed.2d 106 (1995); Thomas Jefferson University v. Shalala, --- U.S. ----, ----, 114 S.Ct. 2381, 2386, 129 L.Ed.2d 405 (1994), a principle we applied to § 413.130 in Carle Foundation Hospital. The district court in St. Vincent Memorial Hospital gave too much sway to the compilers of a dictionary, too little to the rule's author.
 
 
 13
 "Lease" can cover everything from the British 99-year ground lease (a close substitute for title) to financing leases (close substitutes for purchases on credit, with a purchase money security interest) to sale-and-leaseback deals (which enable owners to borrow against the value of their assets) to term leases without commitment to long term possession (e.g., the admiralty barebottom charter) to daily or even hourly leases (e.g., hotel rooms or rental cars). Lessees get possession under each device, but they have very different economic attributes. Long-term or financing leases entitle the lessees to treat the assets as if owned; the lessees bear the market risk of changes in value but also obtain any gains from this source. Tax law allows such lessees to obtain the legal benefits of ownership (including depreciation); the Medicare regulations follow suit. Yet no one, we suppose, would think that an auto rented for a single day, at a price of 50 cents per mile, qualifies as a capital asset under § 413.130(b)(1). The duration, risk, and payment terms make the rental car functionally equivalent to the purchase of a service (say, a ride in a taxi). We concluded in Carle Foundation Hospital that the Secretary is trying to limit capital-asset treatment to leases near the financing-lease side of the spectrum, and is entitled to read the phrase "possession, use, and enjoyment of the assets" in that light--as signifying the type of control an owner enjoys.
 
 
 14
 The Hospital does not dispute the Administrator's conclusion that it lacks that kind of control. Repairs and updates are in the hands of USMM; changes in the market value of the equipment work to the benefit or detriment of USMM; any alteration in the Hospital's pattern of use is on USMM's tab; if patients from elsewhere use the CT scanner at Salem Hospital (as the Hospital's patients once went to Centralia), USMM rather than the Hospital reaps the additional revenue. The economic terms on which the Hospital uses this scanner are little different from those on which the vending machines in its halls dispense soft drinks. One arm of the federal government recognizes this by allowing USMM to depreciate the CT scanner and reduce its taxes; it cannot be arbitrary and capricious for another arm of the federal government to reach the same conclusion: that USMM rather than the Hospital incurs the capital-related costs and benefits.
 
 
 15
 AFFIRMED.